2025 IL App (4th) 240284-U

NO. 4-24-0284

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 9, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| MKM OIL, INC. and FAST BREAK FOODS, LLC, as | ) | Appeal from the |
| Successor in Interest to Fast Break Food Mart, Inc., | ) | Circuit Court of |
| Plaintiffs-Appellees, | ) | Tazewell County |
| v. | ) | No. 16L34 |
| WILLIAM G. WELK and TRAVIS WELK, | ) | |
| Defendants | ) | Honorable |
| (William G. Welk, Defendant-Appellant). | ) | Paul E. Bauer, |
| | ) | Judge Presiding |

JUSTICE KNECHT delivered the judgment of the court.
Justices Doherty and Cavanagh concurred in the judgment.
Justice Doherty also specially concurred.

**ORDER**

¶ 1   *Held*: The appellate court affirmed the trial court's judgment in favor of plaintiffs based on their claims of breach of contract and tortious interference with business expectancy, finding defendant forfeited multiple issues and holding the court properly denied defendant's motion for judgment notwithstanding the verdict or for a new trial and properly awarded plaintiff Fast Break Foods, LLC, prejudgment interest. The court reversed the trial court's award of prejudgment interest to plaintiff MKM Oil, Inc. The court remanded with directions for the trial court to determine the reasonable amount of attorney fees to be awarded to plaintiffs for their defense of the appeal.

¶ 2   In March 2016, plaintiff Fast Break Foods, LLC (hereinafter Fast Break or Fast Break Foods, LLC), as successor in interest to Fast Break Food Mart, Inc., the lessee and sublessor of a gas station and convenience store, and plaintiff MKM Oil, Inc. (MKM), Fast Break's sublessee, filed a complaint against defendants, William G. Welk and Travis Welk, seeking damages based on the failure of Welk, as the lessor and owner of the premises, to

consent to an assignment of the sublease to TA Operating LLC, also known as Travel Centers of America (TA). Travis was listed on the lease as part of an estate plan and was not actually involved with the lease or the trial. Travis has not filed a brief on appeal. In the complaint, plaintiffs alleged causes of action based on breach of contract and tortious interference with business expectancy.

¶ 3          In October 2022, the trial court denied Welk's motion for summary judgment. In June 2023, a jury found in favor of plaintiffs and awarded both actual and punitive damages. The court denied Welk's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

¶ 4          On appeal, Welk raises numerous issues, which we consolidate as arguments the trial court erred by (1) failing to grant Welk's motion for summary judgment; (2) failing to grant his motion for judgment notwithstanding the verdict based on insufficient evidence to support the verdicts and amount of damages; (3) failing to grant his motion for a new trial based on (a) errors in giving the jury an instruction on waiver and giving nonpattern instructions and (b) allowing testimony from an accountant based on hearsay and references to documents withheld during discovery; and (4) awarding prejudgment interest to both plaintiffs and awarding attorney fees to Fast Break. Plaintiffs filed motions on appeal, seeking a remand for an award of attorney fees for the costs of defending the appeal.

¶ 5          We reverse the award of prejudgment interest to MKM and affirm in all other respects. We remand with directions for the trial court to determine the reasonable amount of attorney fees to be awarded to plaintiffs for their defense of the appeal.

¶ 6                                        I. BACKGROUND

¶ 7                              A. General Background and Lease Provisions

¶ 8        On March 31, 2016, MKM and Fast Break filed a complaint alleging multiple counts of breach of contract and intentional and unjustified tortious interference with business expectancy in connection with Welk's refusal to consent to a transfer of the sublease of the premises from MKM to TA. Welk filed counterclaims for breach of contract, alleging Fast Break failed to (1) enter a new lease or obtain a valid assignment of the lease when it reorganized as Fast Break Foods, LLC, (2) maintain the premises as required by the lease, and (3) make all required rent payments. In October 2022, the trial court denied a motion by Welk for summary judgment. In June 2023 a jury trial was held.

¶ 9        Evidence at trial showed Welk was a real estate developer who purchased the property in 1996 and developed a gas station with a convenience store and restaurant there. As part of the development, the Village of Morton issued a building permit based on a site plan that depicted the gas station having a rear setback (rear parking area), which was used to satisfy the village's parking requirements.

¶ 10        In October 1999, Fast Break Food Mart, Inc., leased the property from Welk for 20 years, with a 10-year renewal option and, in November 2005, assigned its rights and interests to Fast Break Foods, LLC, which was a successor in interest with common owners. Fast Break was owned and operated by Charles Feeney and his family, and Feeney personally guaranteed Fast Break's performance under the lease. Under the lease, Fast Break owed $10,500 in monthly rent, plus 0.5 cents per gallon of gasoline sold at the station. Fast Break also paid real estate taxes and paid for insurance. In 2005, MKM subleased the property and operated the gas station and convenience store, which were rebranded as a British Petroleum (BP) station under an agreement with BP Products North America, Inc.

¶ 11        In 2015, MKM entered into a purchase agreement with TA under which TA

would acquire MKM's interest in various properties, including its sublease of the gas station and convenience store. Fast Break verbally consented to the transfer of the sublease. Fast Break also alleged it contacted Welk based on the following provision of its lease with Welk:

"Lessee may not assign this lease or sublease the premises, or any right or privilege connected therewith, without the express written consent of the Lessor, which shall not be unreasonably withheld. It is specifically acknowledged that Lessee intends and Lessor is agreeable to Lessee subletting at least a portion of the premises, pending Lessor's consent to any specific sublessee. In the event of any such assignment or sublease it shall not alter Lessee's responsibility to Lessor under this Lease. Lessor agrees to accept rent from Lessee, its assignee, or sublessee. Irrespective of whether this lease is assigned or the premises sublet, Lessor shall remain responsible for the full performance of all terms and conditions of this Lease."

¶ 12 The lease also had the following waiver provision:

"No waiver by either of the parties hereto of any provision or breach thereof, shall be deemed a waiver of any other provision or of any subsequent breach by Lessor or Lessee of the same or any other provision. Lessor's or Lessee's consent to or approval of any act shall not be deemed to render unnecessary the obtaining of Lessor's or Lessee's consent to or approval of any subsequent act."

¶ 13 The lease provided, "The Lessor shall have the option to extend this Lease for ten years by giving Lessor sixty (60) days written notice prior to the expiration of the Lease that Lessee chooses to extend." That statement, providing the "Lessor" to give the "Lessor" notice, led to a dispute between the parties at trial as to who had the right to extend the lease. The lease

also required the lessor to give notice before the expiration of the lease and provided the lease would automatically renew if notice was not given, unless the lessee gave notice it did not intend to renew the lease. That option to extend was conditioned on the lessee not being in default at the time the option was exercised.

¶ 14    The lease contained the following section concerning repairs and maintenance:

"Lessee, at its expense, shall be responsible for maintaining the interior and exterior of the leased premises. Such maintenance includes but is not limited to maintaining in good condition the plumbing, hot water heater, and electrical systems. Lessee shall benefit by any reductions in the costs of such maintenance due to any manufacturers warranties. Lessor shall be responsible for all maintenance and repairs to the driveway or [heating, ventilation, and air conditioning (HVAC) system]."

¶ 15    The lease contained the following provision regarding attorney fees:

"Lessor or Lessee shall pay all reasonable attorney's fees incurred by the other in enforcing the terms and [*sic*] of this Lease, including forfeiture or specific performance, or in defending any proceeding to which Lessor or Lessee is made a party defendant as a result of the acts or omissions of the other party."

¶ 16    The parties had disagreements about repairs needed to the property and the inclusion of the rear parking area in the lease. Ultimately, Welk did not consent to the assignment of the sublease from MKM to TA, resulting in cancelation of the agreement between MKM and TA. The issues of whether Welk's refusal to consent to the assignment of the sublease was a breach of contract or tortious interference with business expectancy and whether Fast Break first beached the terms of the lease, thus excusing any breach by Welk, were the subject of

the trial.

¶ 17                              B. Trial

¶ 18                              1. *Feeney*

¶ 19        At trial, Feeney testified about his operation of Fast Break in conjunction with family members, Fast Break's lease of the premises, and its sublease of the gas station and store. According to Feeney, when he negotiated the lease, he told Welk he was going to sublet portions of the property.

¶ 20        Feeney testified he and his daughter walked the property with Welk before he entered into the lease, including the rear parking area. Welk told Feeney employees would have to park in the back because there was not enough room in the front. Welk never stated the lease did not include the rear parking area. Feeney identified a photograph of the property that included the rear parking area. A high-rise sign and dumpster for the property were also kept in the rear area.

¶ 21        The lease included a legal description of the property, but Feeney did not have the property surveyed. Feeney stated that in his decades of doing business involving leasing properties, he never had surveyed a legal description in a lease. Instead, he stated:

> "Maybe in this day and age I'm naive but no, and we leased a lot of property. If we bought a property, obviously, we had it surveyed and had a legal description. On leased property, we always felt like what you see is what you get, you know. This picture is what we thought we were leasing."

Feeney stated he thought he was leasing everything encompassed by the curbs, including all of the concrete and an area of grass in which he had to maintain a sprinkler system.

¶ 22        Feeney also discussed a "grassy area" behind the property with Welk. Welk said

there could be an opportunity to build a car wash or lube center there and he would give Feeney a one-year option for that. The lease provided, if Feeney did not exercise the option, the lessor would have the right to ingress and egress across the leased property if the lessor developed the property as a car wash or lube center before October 5, 2001. Feeney testified Welk could reach the property via a "curb cut."

¶ 23 Feeney testified he believed the renewal option in the lease gave him the right to extend the lease. He noted the line stating the lessor shall have the option to extend the lease by giving notice to the lessor and indicated it did not make sense.

¶ 24 Feeney testified Fast Break paid all rent due and Welk accepted it. Feeney also testified Fast Break maintained the property as required by the lease. Welk was responsible for all maintenance and repairs to the HVAC system and parking lot and supplying water for the irrigation system. Feeney maintained the sprinkler system and mowed the grass.

¶ 25 Feeney testified Welk would contact him about maintenance during the course of the lease. About six months after entering into the lease, Welk asked Feeney to redo the landscaping, which Feeney did. Feeney stated Welk failed to maintain or repair the HVAC system, which was expensive, and Fast Break repaired the system multiple times. Later, MKM replaced the system. Welk later replaced an HVAC system for the restaurant.

¶ 26 Welk also expressed concern about drainage in the parking lot and blamed Fast Break, stating Fast Break was not picking up trash. Feeney stated that was not true and Fast Break had regular routines for keeping the lot clean. Feeney also had problems with floor tiles coming loose due to moisture and tried to work with Welk to have a moisture barrier installed and tiles replaced. Welk disagreed there was a problem, and Feeney had to repair floor tiles a few at a time. Feeney agreed the tile repairs were his obligation under the lease.

¶ 27 In 2005, Rick Marketti, an owner of MKM, proposed buying Feeney's businesses. Feeney was of retirement age and sold all of his properties except Fast Break to MKM. Then, in 2006, MKM expressed an interest in subleasing the gas station and store. The record shows a previous sublessee of the gas station and store had encountered financial difficulties. Feeney wrote to Welk, informing him of MKM's interest and requesting Welk's consent to the sublease. Welk responded he needed financial statements form MKM, six months' rent in escrow, and the addition of late payment provisions. Feeney provided Welk with MKM's financial information. While waiting for Welk's consent, MKM began managing the gas station and store. Feeney followed up with Welk on several occasions, again requesting Welk's consent to the sublease. Welk never responded in writing. However, Feeney stated he had conversations with Welk and stated, "[S]ome of them were okay and some of them were pretty tough." Feeney testified about a specific conversation, stating:

> "So I was trying to convince him that I needed this in writing, and the only thing he said was, you know, he refused to give it to me in writing but he did say and I know this is he said she said stuff but he said, I won't stop you but I'll never give it to you in writing. And, you know, being a small town guy, that's really all I needed."

Feeney testified he then believed Welk was going to leave him alone or would not sue him over the matter. MKM then began operating under the sublease and contributed $8,300 toward Fast Break's monthly rent, plus 0.5 cents per gallon of gasoline. MKM did not sublease the restaurant.

¶ 28 Feeney testified MKM rebranded the gas station as a BP station and installed new gasoline dispensers, canopies, and canopy column covers. A new high-rise sign was installed and

a new sign was put out front. MKM also remodeled the bathrooms. Welk met with Feeney and Marketti as a "get-acquainted" type of meeting, and they showed Welk the improvements. However, Feeney's testimony and the record indicated Welk disliked Marketti because of disagreements over the need for HVAC system repairs. Feeney testified Welk subsequently said he did not want to speak with Marketti again. Feeney testified Welk referred to Marketti as "that blankety, blankety, blankety guy" and told Feeney, "He's a blankety blank, and he is your tenant. He is not my tenant." Because Welk refused to speak with Marketti, Feeney generally acted as an intermediary regarding communication between Welk and Marketti.

¶ 29        In 2015, Feeney contacted Welk, seeking consent to assign MKM's sublease to TA, who was a large operator of gas facilities. Welk responded he would need financial information on the potential sublease company and various documents concerning the existing sublease. He also gave a list of required repairs. The list included 11 items, including repair to a drain in the rear parking lot. Later, a meeting was scheduled concerning repairs, and Welk demanded $75,000 be put in escrow or he would not attend the meeting. Feeney testified he had started or completed all of the repairs on the list and refused to put money in escrow. Feeney said he performed all of the maintenance required by the lease. He also stated he felt the repairs demanded by Welk to agree to assign the sublease were a waste of money because TA would come in and redecorate the building, although he agreed TA would not have an obligation to do so.

¶ 30        Feeney testified TA was a suitable tenant for the property because it was a Fortune 500 company and was going to pay its lease. He said Welk never expressed concern TA would not be a suitable tenant or would be unable to financially operate the gas station and store. In the past, Welk had conditioned giving consent for a sublease on various repairs being done.

Feeney said he always did the repairs.

¶ 31 On cross-examination, Feeney admitted Welk once sent him a letter stating Fast Break had subleased a portion of the restaurant without Welk's consent and Welk stated if any other sublease were ever entered into without a written request and Welk's approval, Welk would sue for damages and noncompliance of the lease agreement. Welk also sent letters voicing concerns about needed repairs and demanding they be completed. Welk also accused Feeney of late payments and lack of repairs when CGH, Inc. (CGH), was the sublessee. However, Feeney testified those things were not true and any problems with the previous sublessee had been rectified when Feeney added MKM as a sublessee.

¶ 32 During negotiations concerning the assignment of the sublease to TA, Welk sent multiple additional letters listing repairs he wanted done across the property, including in the restaurant, which was not part of the sublease, and expressing various other concerns. Feeney generally agreed to do all of the repairs, except for taking care of some items in the restaurant. Feeney testified the restaurant was vacant at that time and a new subtenant would want to decorate the area according to their branding. Feeney stated he was seeking damages in the amount of attorney fees he incurred before he filed suit in the case.

¶ 33 2. *Marketti*

¶ 34 Marketti testified about MKM's business and branding of gas stations and stores. When MKM expressed interest in the gas station and store, Marketti met with Welk, and he provided financial information to Feeney to pass along to Welk. When MKM began running the gas station and store, Marketti was under the impression Welk had agreed to the sublease.

¶ 35 When the gas station was converted to a BP station, MKM spent around $150,000 on rebranding. MKM also "cleaned the whole place up" and "kind of freshened it up." MKM

made additional capital improvements to the property, including making the property compliant with the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 (2000)) and remodeling the bathrooms. The sump pump in the basement was not working, and MKM cleaned it up and installed new drywall and lights. Marketti testified he met with Welk and showed him some of the improvements that had been made.

¶ 36     Marketti testified there was a time Welk expressed concern about the drain in the rear parking lot getting clogged when it rained. Welk said MKM needed to clean out the drain, which MKM did. Marketti also testified about problems with the HVAC system, which was Welk's responsibility under the lease. The heating system stopped working and needed to be replaced. Marketti asked Feeney to contact Welk about it. Welk responded there was nothing wrong with the system. After getting a second opinion about the need for a replacement instead of a repair, Welk again did not take care of the issue. Because it was December at that point, MKM replaced the units. When the replacement was done, it was discovered the electrical box in the basement had the breaker pulled out of it and the wires cut. Marketti did not know who did that or why. MKM fixed the wiring.

¶ 37     Marketti testified communication with Welk was often difficult and Welk preferred to talk to Feeney about the business instead of Marketti. Marketti testified about a meeting in which Welk was "volatile" and berated Feeney about things Feeney had not done. After the incident with the HVAC system, Welk refused to speak to Marketti.

¶ 38     Regarding the rear parking area, Marketti testified there had never been a dispute about the area not being included in the lease or sublease. Welk also never challenged the validity of MKM's sublease. At some point, Marketti became aware there was an issue with the property description in the lease because it did not include the rear parking area. He believed it

was a mistake and testified it was a matter for the attorneys to solve when finalizing the deal with TA.

¶ 39 Marketti testified about the agreement with TA for the purchase of MKM's assets. Like Feeney, Marketti was also of the opinion TA would be a suitable sublessee of the property. TA and MKM agreed on $1,079,666 for the assignment of the sublease of the property, which was contingent on Welk's consent. TA placed the money in escrow pending finalization of the agreement.

¶ 40 Marketti testified MKM provided Welk with TA's financial information. Welk did not consent to the assignment of the sublease and instead proposed a new sublease between Fast Break and TA. Marketti said he had no problem with that, but then it did not happen. Instead, in September 2015, Welk sent a list of required repairs and asked for $75,000. Marketti did not agree the repairs were needed and testified the property "was in very good shape." However, he and Feeney agreed to do the repairs. Meanwhile, the remainder of MKM's deal with TA for conveyance of the other properties was completed. The contract with BP then expired, and MKM could not get another supplier for fuel for the sublease of Welk's property. That created a hardship to running the store. Thus, TA and MKM entered into an interim management agreement under which TA would operate the gas station and store until the sublease to TA could be finalized.

¶ 41 Marketti testified negotiations continued with Welk to obtain consent for assignment of the sublease. In October 2015, Welk provided a new list of required repairs. Marketti and Feeney did not agree with many of the items on the list but agreed to make the repairs to get the deal done. Welk also demanded MKM pay his legal fees. MKM agreed to do so and paid $7,800, consisting of $2,800 for Welk's fees to date and $5,000 to apply to future fees.

Afterward, Welk sent additional demands for payment of legal fees on multiple occasions.

¶ 42 On November 13, 2015, Marketti met with Welk and the attorneys for the parties, believing the deal was going to be finalized and consent given for the sublease. However, Welk changed the meeting location to a hotel conference room, presented a new list of required repairs, and demanded $232,900 to complete the repairs. Later evidence at trial showed that amount was $40,000 more than the total of the amount of the individual items on the list. Marketti testified most of the repairs were not needed. MKM initially agreed to pay the money, but Welk still did not consent to assignment of the sublease. Thus, MKM did not pay the money.

¶ 43 TA extended the time to reach an agreement to February 2016. At some point, it was suggested Welk try to deal directly with TA, which was agreeable to MKM. However, an agreement was never reached, and the assignment of the sublease never occurred. As a result, MKM left the property and ceased payment of rent to Fast Break.

¶ 44 3. *Doug Heathcock*

¶ 45 Doug Heathcock, MKM's attorney, testified about issues with the legal description of the property in the lease, which he repeatedly described as an "error." Heathcock testified 100 feet of the rear parking area was used as part of the lease but had not been included in the legal description. Heathcock testified the parking area would be required to be part of the lease under local zoning ordinances to ensure the property had sufficient parking. Heathcock worked to fix the description through an amendment to the lease. He testified the issue of the property description was brought up during negotiations with Welk, but Heathcock did not believe it was an actual issue in terms of getting the deal finalized.

¶ 46 On cross-examination, Heathcock was asked about easements to access the property behind the gas station and store through the rear lot. Heathcock indicated that was the

first time an easement had been brought up in the matter. Heathcock said if Welk were to testify the use of the rear lot was permissive and not part of the lease, that testimony would not be credible. Heathcock summarized his view of the issue as a "made-up pretext" by Welk because use of the area had never been an issue before the assignment of the sublease was proposed. He also stated, "And as the negotiations went on, this issue and other issues were fabricated and created."

¶ 47    Heathcock also testified about various difficulties in communicating with Welk and in reaching an agreement with him. He also generally provided testimony consistent with that of Feeney and Marketti. Heathcock stated Welk demanded a signed release by the "existing sublease company," which showed Welk knew MKM was a sublessee. He did not know what Welk meant by seeking a "release." Heathcock also testified about other statements Welk made indicating he knew MKM was a sublessee.

¶ 48    Heathcock testified Welk's demand MKM pay his attorney fees was highly unusual and had no basis in law. He also found the demand to create a new sublease directly with TA unusual. However, MKM agreed to do so to move forward with the deal. He testified he believed the repairs did not have to be completed before assignment of the sublease, stating, "There's nothing in the lease that permits lessor to withhold its reasonable consent in order to gain concessions from the lessee, the current sublessee, or the proposed assigning or sublessee." Nevertheless, MKM and Fast Break agreed to complete the repairs in order to finalize the deal.

¶ 49    Heathcock testified the first he heard of concerns about the validity of MKM's sublease was at the November 13, 2015, meeting. At that meeting, Welk handed out a packet of materials with multiple new demands. The materials included the statement, "Is there a lease and was the present lease done fraudulent? No existing lease to sublease with MKM." Welk then said

he was going to negotiate his own lease with TA. Afterward, Welk demanded Heathcock give written consent for Welk to discuss a new lease with TA, which Heathcock found odd and unnecessary. Nevertheless, he provided consent.

¶ 50 Welk's attorney subsequently withdrew, and Welk demanded the payment of $232,900, personal guarantees of performance under the lease from Feeney, Marketti, and their family members, and a new payment of legal fees. Heathcock testified Welk initially said he agreed to correct the property description error in the lease. Heathcock then spoke with Welk on the phone and testified, "[W]e spoke for about ten minutes which was much longer than any conversation I had with Mr. Welk before. He'd hung up on me before." During the call, Welk told Heathcock he was not going to negotiate. Welk wanted personal guarantees not only for the sublease to TA but also guarantees for the obligations of the restaurant portion of the property, which was not part of the sublease. Heathcock testified he asked Welk why MKM would guarantee obligations it was not responsible for and Welk said because MKM wanted the deal and if it would not do so, there would be no deal. Heathcock testified Welk was rude and an agreement was not reached.

¶ 51 4. *Roger Spangler*

¶ 52 Roger Spangler, a zoning officer, testified the building plan for the property included the rear parking area. The inclusion of the rear parking area allowed for the property to comply with parking requirements. He said a site plan without that area would not comply. Spangler stated the grassy area behind the property could not be developed unless it was something connected to the gas station, such as a car wash, with access through the existing gas station property.

¶ 53 5. *Roger Stone*

¶ 54        Roger Stone, an accountant and fraud examiner, testified about the value of the property and the TA contract. He indicated the amount of $1,079,666 was an accurate value for the proposed assignment of the sublease. During his testimony, Stone stated he reviewed various documents. During direct examination, Welk's counsel did not object.

¶ 55        During redirect examination, counsel for MKM asked Stone about a spreadsheet providing TA's estimation of the value of all of MKM's properties. Welk's counsel objected because the document had not been produced, and MKM's counsel withdrew the question. Counsel for MKM then asked Stone what sources he used to learn of the offer made by TA. Welk's counsel objected based on hearsay. The objection was overruled. Stone testified he asked for evidence of the offer and was told it was an agreed amount. Shortly after, Welk's counsel stated, "Just for the record, Your Honor, based on that additional testimony, I renew my motion." He did not clarify what that "motion" was. The trial court responded, "All right. Your motion's denied."

¶ 56                                    6. *Kristi Feeney Stone*

¶ 57        The defense presented the deposition of Kristi Feeney Stone, Feeney's daughter, who was previously employed by Fast Break. Feeney Stone identified the letter Welk sent to Fast Break concerning a previous restaurant sublessee and stating Fast Break could not sublease the property without express written consent. The letter also required all outstanding maintenance be completed and financial information about the sublessee be provided. There was also a reminder about rent, but Stone did not recall there ever being an issue with rent being late. Feeney Stone indicated she felt the property had been well maintained and stated it looked good. Feeney Stone verified she had walked the property with Feeney and Welk when the lease was first entered into and identified the rear parking area as the location where employees would park. A dumpster

was also in the rear area. She stated Fast Break believed the rear area was part of the lease.

¶ 58                                    7. *Jane Ohaver*

¶ 59        Jane Ohaver, Welk's former attorney, testified about the letter sent regarding a previous restaurant sublessee. She stated it was normal to ask for repairs before approving a sublessee and seek financial information about prospective sublessees. Welk had also informed Ohaver of late rent payments. Feeney Stone replied to the letter that consent could not be unreasonably withheld and asked for a list of repairs. Ohaver sent a list, and Feeney Stone did not object to any of the requested repairs.

¶ 60                                    8.*William Anderson*

¶ 61        William Anderson, an attorney who represented Welk during the negotiations concerning TA, testified his understanding was Welk did not know about MKM or know of MKM's sublease and had not given consent for Fast Break to sublease the property to MKM. Anderson testified Welk was concerned about who was taking care of the property and the profitability of it. He stated Welk had inspected the property and was unhappy with its condition. Thus, a list was made of needed repairs. Anderson said, "I eventually saw a sublease." He testified he also learned Fast Break Food Mart, Inc., had reorganized as Fast Break Foods, LLC.

¶ 62        In September 2015, Anderson met with Welk and Fast Break's attorney to walk the property and document items needing repair. Anderson described the repair issues, stating there were issues with the basement ceiling caused by a leak from above, missing and cracked floor tiles in the gas station, and issues in the restaurant. Anderson described the gas station as "not clean" and in need of paint and general maintenance. Outside, the siding had issues, the sign was broken, and the roof was leaking. There were also landscaping issues, and the parking lot drain was not kept clear. Anderson believed a general agreement was reached for Fast Break to

complete the repairs and Fast Break seemed to agree the repairs were necessary.

¶ 63　　　　　According to Anderson, plaintiffs made clear they would do the repairs only if Welk would sign documents amending the property description in the lease and consent to the assignment of the sublease. He said TA also wanted a 10-year renewal option. Anderson was concerned plaintiffs were only agreeing to take care of the property and perform the maintenance required under the original lease if Welk would agree to the new sublease with TA.

¶ 64　　　　　In November 2015, Anderson told plaintiffs it was his belief MKM was never a legal subtenant and Welk needed an agreement the repairs were going to be made. He also indicated there was concern about the validity of the lease with Fast Break when it reorganized from Fast Break Food Mart, Inc., to Fast Break Foods, LLC. Anderson described the negotiations at that point as lacking significant movement on the part of either party. Anderson testified Welk asked plaintiffs to pay his attorney fees because it was necessary for him to be represented while they negotiated the TA deal.

¶ 65　　　　　On November 12, 2015, the parties agreed to meet the next day to attempt a resolution of all pending issues. Anderson attended the November 13, 2015, meeting. Anderson indicated he believed the list of repairs presented by Welk at the meeting was not a new list but was the list created from the earlier walkthrough. Anderson testified concerns were raised about the rear parking area and Welk's belief that including it in the lease would interfere with rights to the property behind the premises. MKM said it could not waive that requirement, and Welk then offered to negotiate directly with TA. Anderson believed it was important for MKM and Fast Break to give consent to Welk to talk to TA directly to avoid Welk from being accused of interfering in their business dealings with TA. Anderson stated plaintiffs refused to perform the repairs without the TA deal being finalized. Shortly after, Anderson stopped representing Welk.

He testified the repairs had not been completed at that time.

¶ 66 On cross-examination Anderson was impeached with his deposition testimony, in which he stated he could not recall any meetings or conversations with Fast Break's attorney. In his deposition, Anderson stated he did not recognize multiple documents and stated he lacked personal knowledge of contents of the lease with Fast Break. He also stated in his deposition he had no specific memory of the terms of the lease TA wanted. However, he did recall something about a sublease to MKM that Welk had not approved. Anderson admitted neither he nor Welk ever issued a notice of default to Fast Break or otherwise sought to terminate the lease based on the lack of repairs.

¶ 67 9. *Kevin Anderson*

¶ 68 Attorney Kevin Anderson (Kevin), who is unrelated to William Anderson, testified he previously represented Welk and became aware of issues with the gas station and store in July or August 2015. Welk brought notebooks with photographs concerning repairs needed at the property to show Kevin.

¶ 69 Kevin spoke with Heathcock about the amended property description, which Heathcock characterized as a scrivener's error. However, Kevin stated Welk told him it was not an error and said he told Heathcock that. Kevin testified Heathcock refused to acknowledge the property description was not a mistake. He also stated Welk was willing to consider a sublease with TA but only if it comported with the terms of the original lease. However, plaintiffs kept trying to add things to the lease and had presented the issues as "either do it their way or we're gonna sue you." Kevin also addressed concerns about the reorganization of Fast Break Food Mart, Inc., to Fast Break Foods, LLC, stating there was a period of seven months with no entity in existence and he questioned the validity of the assignment of rights to Fast Break Foods, LLC.

¶ 70    Kevin described the negotiations as difficult and stated, "I mean again everything that we raised as an issue was no big deal, ignore it, do it our way or we're gonna sue you, and *** it's no way to negotiate. There was never any negotiation to be honest with you." Kevin said Welk told him he did not know who MKM was and he did not have a contract with MKM. According to Kevin, Welk believed Fast Break was running the gas station and store. Kevin also was not given a copy of the sublease.

¶ 71                                    10. *Christian Lane*

¶ 72    Christian Lane, an attorney who worked for First American Title Company, testified about the escrow agreement and indicated the property description in the lease appeared to be a correct description of the property. However, he could not speak to what the intentions of the parties were regarding the property and the rear parking area.

¶ 73                                    11. *Welk*

¶ 74    Welk testified about his experience as real estate developer. He stated when he developed the property, he was familiar with cross-easements and shared parking issues when properties were close together. He stated one property was platted for the store and the back part was separate because he wanted to develop the property behind the premises at some point. His intent was to have the rear parking area be a shared feature. Welk testified he was specific in his instructions to his attorney that the lease not include the rear parking area and said he never told Feeney the area was part of the lease. Welk said it was not a mistake that it was left out. Welk testified he would agree in writing that TA could use the area if it stepped into the shoes of MKM through assignment of the sublease as originally written, but he would not include the rear parking area in the lease. Plaintiffs did not agree to that proposal.

¶ 75    Welk testified Feeney knew he had to get written consent to sublease the property.

Welk said he wanted control over what businesses were on the property. When a sublease was sought, Welk would automatically raise questions about needed repairs before the sublease was approved.

¶ 76 In 2005, Welk sent Fast Break a letter stating it had come to his attention Fast Break leased a portion of the restaurant without written consent. Welk wrote that if any other sublease was ever entered into by Fast Break without a written request and Welk's approval, he would sue for damages and noncompliance with the lease agreement. He also provided a list of needed repairs.

¶ 77 Welk provided notebooks concerning the repairs needed to the property before he would consent to the assignment of the sublease to TA. The notebooks contained photographs of the condition of the property at the time of the original lease and photographs taken at a later date, but the record is not clear what the date was. However, the record indicates it was in January 2006. Welk described multiple issues shown in the photos, such as a lack of signage, garbage in the rear area, and siding that needed repair. Welk testified about the importance of curb appeal for the business and said he asked Fast Break to replace the flowers six months into the lease because they were annuals that had died and needed to be replanted. Welk stated Fast Break then planted perennials but did not take care of them. Welk said he requested repairs to the storm drain because it was clogged due to Fast Break failing to keep the parking area clean. Welk said Fast Break partially repaired the issues but never completed the repairs. Welk believed the renewal terms in the lease stating the lessee had the option to renew the lease depending on the lessee not being in default allowed him to seek repairs before allowing an extension.

¶ 78 Because CGH had gone out of business and Welk had constant problems with maintenance and late payments when it was the sublessee, he requested a change to the lease,

requiring financial statements and personal guarantees from new subtenants. He also sought a 10-day notice to demand the property be in the same condition as when Fast Break received it and 6 months' rent in escrow in advance. Welk further sought to add all back interest for late payments, interest, and a $500 late penalty. Fast Break did not agree to those changes to the lease.

¶ 79       Welk Identified a letter Feeney sent to him in May 2006 stating MKM was interested in subletting the gas station. He also said Fast Break gave him financial information about MKM and he knew MKM was going to manage the property while waiting for approval to sublease. At some point Welk was told MKM might buy stock in Fast Break. Welk stated there was no sublease and he had no reason to believe MKM was subletting the property.

¶ 80       In 2015, Feeney called Welk about the TA deal. He did not mention TA by name and said he wanted to send Welk some paperwork. Welk said he told Feeney he did not have a sublease with MKM and MKM was a management company. Feeney did not correct him. Feeney sent a packet of information and documents, which was the first time Welk learned of the sublease, although the packet did not contain a copy of it. Welk sent the documents to Kevin.

¶ 81       Welk also testified he did not know who Fast Break Foods, LLC was and stated he did not know about the transfer of the business from Fast Break Food Mart, Inc., to Fast Break Foods, LLC. He also testified plaintiffs did not give him enough time to address his concerns when they sent him letters seeking the assignment of the sublease. Welk said he was agreeable to the assignment as long as the required maintenance was performed.

¶ 82       Welk testified he attempted to negotiate directly with TA, but TA refused "because they didn't want to get in between MKM and TA." Welk also asked TA if it was interested in purchasing the property. Welk asked for $3.2 million, and TA offered $2.4 million.

No agreement to sell the property was reached.

¶ 83         On cross-examination, Welk admitted he never sent Fast Break any notices it was in breach of the lease. He also admitted he never told Fast Break it failed to do the repairs he requested in 2006 that were depicted in Welk's notebooks.

¶ 84         Welk identified a 2006 letter stating MKM wished to sublease the gas station and store and other related documents. Welk also admitted he knew MKM had remodeled the bathrooms and replaced two HVAC units. However, he stated the HVAC units did not need to be replaced and denied Feeney ever told him Fast Break had a sublease with MKM. He denied knowledge of the other improvements made by MKM. Welk also admitted Fast Break paid him all rent due during the time it leased the property, but some payments were late. Welk never recorded any easements across the leased property and admitted that, even if the rear parking area were not included in the lease, he would have to cross the leased property to access the property behind it.

¶ 85         Welk had testified on direct examination Fast Break's offer to do repairs was conditioned on Welk signing documents that would amend the lease to include the rear parking area. However, on cross-examination, he was asked, "[W]ith respect to the maintenance, your requirement was that it be done before you signed [the lease assignment], correct?" Welk responded, "[Y]es, basically that was the deal."

¶ 86                                          12. *Closing Arguments*

¶ 87         In closing arguments, plaintiffs argued Welk knew and of and verbally agreed to MKM's sublease but unreasonably refused to give written consent for it. They argued the parties' intent was always for the inclusion of the rear parking area in the lease and its absence from the property description was a mistake. They further argued the property was kept in good

condition, MKM improved the property, and repairs were timely made, including repairs that were Welk's responsibility. Plaintiffs maintained they agreed to Welk's increasing demands for repairs and payment of attorney fees in order to get the deal completed, but Welk kept adding additional, unreasonable demands and conditioned his agreement on his demands being met.

¶ 88        Welk argued Fast Break had previously breached the lease by reorganizing, failing to obtain written consent for MKM's sublease, and failing to properly maintain the property. He maintained the rear parking area was never intended to be part of the lease and plaintiffs refused to perform repairs unless he first agreed to assign the lease as modified to include the rear parking area. In particular, Welk argued the plaintiffs requested improper modifications to the lease, stating:

> "The evidence in this case is that TA never would have agreed to the lease without the hundred feet, so the only question—the repairs were not the big issue with TA. TA was not worried about the repairs. They were seeking the hundred feet and that's all they would take, and by the way, there was a discussion of whether TA was financially responsible.
>
> The question you have to answer in these jury instructions is whether we unreasonably withheld. Yes, they're financially responsible, but they're trying to modify the lease. You heard Kevin Anderson's testimony. Yeah, the thing about financial responsibility is, if they just want to step in the shoes, but if they're trying to do all these changes to the lease, that's a different picture."

¶ 89                    C. Jury Instruction Conference

¶ 90        At the jury instruction conference, Welk tendered an instruction providing a landowner is under no obligation to modify a lease. Plaintiffs argued the issue was not

modification of a lease and instead was whether consent was unreasonably withheld. They noted if Welk proved he intended the lease to exclude the rear parking area, then the withholding of consent would not be unreasonable. The trial court denied the instruction, stating, "That's going to be denied. This is the one I denied yesterday, correct?" The record does not contain a transcript or substitute for a transcript of where the court previously denied the instruction.

¶ 91        The trial court instead gave the following instruction:

"A lessor cannot unreasonably withhold consent if the lessee furnishes a sublessee or assignee that is ready, willing, and able to take over the lease and who, at the very least, meets reasonable commercial standards.

An assignee or sublessee who has agreed to the assignment or sublease and has sufficient funds on hand (or can command necessary funds in time) for the assignment may be deemed as ready, willing, and able to take over the lease.

In assessing whether an assignee or sublessee meets reasonable commercial standards, a lessor can only consider:

[(a)] the financial responsibility of the proposed assignee or sublessee;

[(b)] the type of business that the proposed assignee or sublessee will conduct on the premises; and

[(c)] whether the proposed assignee or sublessee's use of the premises will compete with the business of the lessor or other lessees."

¶ 92        The trial court also gave an instruction on waiver and told the jury waiver would be addressed in the verdict form. Welk objected, arguing waiver was an affirmative defense that was not asserted by plaintiffs in response to Welk's allegations they breached the contract by failing to obtain consent for the sublease.

- 25 -

¶ 93    The trial court instructed the jury regarding a prior material breach as follows:

"William Welk and/or Travis Welk's unreasonable refusal to consent is excused, if Fast Break committed a prior, material breach of contract.

When I use the phrase 'material breach,' I mean the failure to perform a contractual duty that is of such importance that the parties would not have entered into the contract without it. The test is whether the breach is so substantial and fundamental as to defeat the objectives of the parties in making the agreement, or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement. The breach must be so important as to justify the injured party in treating the whole transaction as ended.

To excuse William Welk and/or Travis Welk's failure to perform, William Welk and Travis Welk must prove that Fast Break and/or MKM committed a prior material breach of contract in one or more of the following respects:

Fast Break failed to obtain consent for the Sublease in compliance with the Master Lease.

Fast Break was required to obtain consent for the assignment of Fast Break Food Mart, Inc's rights to Fast Break Foods, LLC.

Fast Break or MKM failed to perform necessary repairs and/or maintenance."

¶ 94    The trial court provided special verdict forms to the jury. The form for Fast Break provided in part:

"[3.] Did William Welk and Travis Welk prove that Fast Break committed a prior material breach of contract?

YES ___ NO ___

If your answer to question 3 is YES, you should then answer question 4. If your answer to question 3 is NO, you should then answer question 5.

[4.] Did MKM prove that William Welk and/or Travis Welk waived a prior material breach of contract?

YES ___ NO ____

If your answer to question 4 is NO, then your deliberations are complete. You should disregard the remaining numbered questions, and go to Verdict B at the end of this verdict and sign it. If your answer to question 4 is YES, you should then answer question 5.

[5.] Did MKM prove it sustained damages?　　　YES ___ NO ____"

The same form was provided concerning MKM.

¶ 95　　In addition, the trial court instructed the jury plaintiffs were required to show they performed all obligations under the contract, including paying all rent due and maintaining the premises in compliance with the lease. The court also instructed the jury Fast Break was required to prove it obtained consent to sublease the gas station and store property to MKM or Fast Break had a valid excuse because Welk provided verbal consent and stated he would not sign anything. Welk does not complain about those instructions on appeal.

¶ 96　　Regarding tortious interference, the trial court instructed the jury it was required to find, in part, Welk intentionally and maliciously interfered with a business relationship or expectancy by refusing to consent to an assignment of the sublease to TA. The court also gave an instruction on punitive damages. None of the instructions mentioned "willful" or "wanton" conduct in the substance of the instruction, although the legal source for the punitive damage

instruction included the label "Punitive/Exemplary Damages—Willful and Wanton Conduct (modified)."

¶ 97    Regarding damages, the trial court instructed the jury, in part, MKM sought direct damages and defined those as follows:

> " 'Direct Damages' are the amount of gain MKM would have received if the parties had fully performed the contract. You calculate the amount of this gain by determining the value of the contract benefits MKM did not receive because of William Welk and/or Travis Welk's breach and then subtracting from that value, the amount you calculate the value of whatever expenses MKM saved because of the breach."

As to Fast Break, the court instructed the jury, in part, as follows:

> "Fast Break seeks a finding that William Welk and/or Travis Welk breached the lease, so that Fast Break is relieved of all further obligations under the lease.
>
> Fast Break also seeks incidental damages for:
>
> Fees spent for an attorney to negotiate with William Welk and Travis Welk while they were unreasonably withholding consent.
>
> 'Incidental Damages' are costs that were reasonably spent either in responding to William Welk and/or Travis Welk's breach of the contract or in securing the benefits William Welk and Travis Welk were to have provided."

Welk agreed to the instruction.

¶ 98                    D. Verdict and Prejudgment Interest

¶ 99        The jury found in favor of plaintiffs and awarded MKM $738,866 in actual

damages and $100,000 in punitive damages. The jury calculated the actual damages based on the

$1,079,666 offered by TA for assignment of the sublease less $348,600 MKM saved in rent

payments because of the breach. The jury awarded Fast Break $17,100 in damages and $250,000

in punitive damages.

¶ 100       On the special verdict forms, the jury found Welk did not prove a material breach

of the contract by Fast Break or MKM. Thus, the jury did not answer question four on the forms

regarding whether Welk waived a prior material breach.

¶ 101       Plaintiffs each sought prejudgment interest under the Interest Act (815 ILCS

205/0.01 *et seq.* (West 2022)). MKM sought $265,622.33 in interest, and Fast Break sought

interest in the amount of $6,148.97 The parties also requested attorney fees. Welk filed a written

response opposing an award of interest and fees. At the hearing on the matter, Welk's counsel

argued against an award of prejudgment interest, but he then stated he was not disputing Fast

Break's interest claim. MKM told the trial court it was seeking prejudgment interest based on an

instrument of writing instead of an unreasonable and vexatious delay in payment.

¶ 102       On the breach of contract claims, the trial court entered judgment in favor of

MKM for $738,866 in actual damages, $265,622.33 in prejudgment interest under the Interest

Act, attorney fees of $334,829.44, and costs of $6,696.52. The court entered judgment in favor of

Fast Break for $17,100 in actual damages, $6,148.97 in prejudgment interest, attorney fees of

$147,575.50, and costs of $3,912.75.

¶ 103       On the tortious interference with business expectancy claims, the trial court

entered judgment in favor of MKM for $100,000 in punitive damages and entered judgment in

favor of Fast Break for $250,000 in punitive damages.

¶ 104                        E. Posttrial Motions

¶ 105         Welk filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. He alleged (1) there was a lack of evidence of a valid contract between Welk and MKM, (2) if there was a contract, plaintiffs breached it by failing to obtain consent for the sublease and failing to perform repairs, (3) there was a lack of evidence the property description in the lease omitted the rear parking area by mistake, (4) Welk did not waive his rights under the lease, (5) there was a lack of evidence of willful or wanton conduct by Welk, (6) the punitive damages award was improper, (7) Fast Break did not prove actual damages, (8) the trial court erred in instructing the jury, (9) the court erred in allowing Stone's testimony based on hearsay and documents not provided during discovery, and (10) the court erred in awarding prejudgment interest and attorney fees. On December 28, 2023, the court denied the motion.

¶ 106         This appeal followed.

¶ 107                        II. ANALYSIS

¶ 108         On appeal, Welk raises numerous issues, which we consolidate as arguments the trial court erred by (1) failing to grant Welk's motion for summary judgment; (2) failing to grant his motion for judgment notwithstanding the verdict based on insufficient evidence to support the verdicts and amount of damages; (3) failing to grant his motion for a new trial based on (a) errors in giving the jury an instruction on waiver and giving nonpattern instructions and (b) allowing testimony from Stone based on hearsay and references to documents that were withheld during discovery; and (4) awarding prejudgment interest to both plaintiffs and awarding attorney fees to Fast Break.

¶ 109                        A. Forfeited Issues

- 30 -

¶ 110    At the outset, we note Welk has forfeited several issues on appeal. In particular, Welk contends the trial court erred with respect to (1) failing to grant his motion for a new trial when it allowed testimony from Stone based on hearsay, (2) allowing Stone to reference documents that were withheld from Welk during discovery, and (3) awarding attorney fees to Fast Break. However, in his brief, Welk does not cite any authority to support his arguments. For example, other than providing basic boilerplate law regarding judgments notwithstanding the verdict and motions for a new trial, Welk does not cite any law concerning hearsay or any possible applicable exceptions. He does not cite any law concerning the effect of reliance on documents not provided in discovery. He also does not explain how any evidentiary error reached a level of prejudice necessary for reversal. Finally, he provides no legal authority concerning the award of attorney fees to Fast Break. Instead, in each instance, he provides mere assertions the court erred, without offering meaningful legal argument or explanation.

¶ 111    Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires an appellant's brief to contain an "[a]rgument" section, "which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." "A contention that is supported by some argument but no authority does not meet the requirements of Rule 341 and is considered forfeited." *Crull v. Sriratana*, 388 Ill. App. 3d 1036, 1045 (2009). Further, "[c]itations to authority that set forth only general propositions of law and do not address the issues presented do not constitute relevant authority for purposes of Rule 341(h)(7)." *Robinson v. Point One Toyota, Evanston*, 2012 IL App (1st) 111889, ¶ 54.

> "A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research

[citation]; it is neither the function nor the obligation of this court to act as an advocate or search the record for error." (Internal quotation marks omitted.) *Mikoff v. United Development, Inc.*, 2024 IL App (4th) 230513, ¶ 42.

¶ 112 Based on the above, we do not address Welk's arguments the trial court erred by (1) failing to grant his motion for a new trial when it allowed testimony from Stone based on hearsay, (2) allowing Stone to reference documents that were withheld from Welk during discovery, and (3) awarding attorney fees to Fast Break. Additional issues regarding forfeiture are addressed as they arise in our discussion of the issues below.

¶ 113                               B. Summary Judgment

¶ 114 We also note Welk contends the trial court erred in denying his motion for summary judgment. However, after the court denied the motion, the case then went to trial, and Welk moved for judgment notwithstanding the verdict. Welk also did not include the issue of summary judgment in his posttrial motion.

¶ 115 A party forfeits an issue for appellate review unless he has raised the issue both at trial and in a posttrial motion. *Thornton v. Garcini*, 237 Ill. 2d 100, 106 (2010). Further, forfeiture aside, "an order denying a motion for summary judgment is not reviewable after an evidentiary trial, as any error in the denial is merged in the subsequent trial." *Paz v. Commonwealth Edison*, 314 Ill. App. 3d 591, 594 (2000)). Therefore, we will address Welk's contentions only in the context of whether the trial court erred in denying his motion for judgment notwithstanding the verdict or for a new trial. See generally *id.*

¶ 116           C. Motion for Judgment Notwithstanding the Verdict

¶ 117                               1. *Breach of Contract*

¶ 118 Welk contends the trial court erred in denying his motion for judgment

notwithstanding the verdict. Regarding the breach of contract claims, he argues (1) there was a lack of evidence of a valid contract between himself and MKM, (2) he did not consent to the sublease between Fast Break and MKM, (3) there was no agreement the rear parking area would be included in the lease, (4) plaintiffs failed to perform repairs, (5) there was a lack of evidence Welk waived provisions under the lease, and (6) he was not required to modify the lease. MKM and Fast Break respond they showed Welk breached the contract by unreasonably withholding consent to the assignment of the sublease and Welk's refusal to consent was not excepted based on a prior material breach by them.

¶ 119    Generally, a judgment notwithstanding the verdict is properly entered in limited cases where all of the evidence, "when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (Internal quotation marks omitted.) *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). In determining the propriety of a judgment notwithstanding the verdict, a reviewing court "does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Id.* The standard for obtaining a judgment notwithstanding the verdict is " 'a very difficult' " one to meet, limited to " 'extreme situations only.' " *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1125 (2000) (quoting *People ex rel. Department of Transportation v. Smith*, 258 Ill. App. 3d 710, 714 (1994)). No court, trial or reviewing, has the right to enter such an award "if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple*, 151 Ill. 2d at 454. We review a trial court's denial of a motion for judgment

notwithstanding the verdict *de novo*. *Ford v. Grizzle*, 398 Ill. App. 3d 639, 650 (2010).

¶ 120    The elements to state a cause of action for breach of contract are (1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages. *Barille v. Sears Roebuck & Co.*, 289 Ill. App. 3d 171, 175 (1997).

¶ 121    "Generally, a lease provision, which prevents the lessee from subletting the premises or assigning the lease without the prior consent of the lessor, is an enforceable provision, provided the lessor has not unreasonably rejected a suitable subtenant shown by the lessee to meet commercially reasonable standards." *Losurdo Brothers. v. Arkin Distributing Co.*, 125 Ill. App. 3d 267, 272 (1984). "It is well established in Illinois that where a lease forbids any sublease or assignment without the consent of the lessor, the lessor cannot unreasonably withhold his consent to a sublease." *Jack Frost Sales, Inc. v. Harris Trust & Savings Bank*, 104 Ill. App. 3d 933, 944 (1982). "But a condition precedent to the lessor's duty to accept a sublessee is the tender to him of a suitable tenant as sublessee." *Id.* Thus, before a defendant may be held liable for failure to consent to a transfer of the lease, the plaintiff has the burden of proving that it had tendered a person or entity who was " 'ready, willing and able' " to take over the lease and who, at the very least, met reasonable commercial standards. *Id.*

¶ 122    Reasonable commercial standards may include the financial responsibility of the proposed subtenant, as well as the type of business the subtenant will conduct on the premises and whether the subtenant's business competes with that of the lessor or any other lessee. *Vranas & Associates, Inc. v. Family Pride Finer Foods, Inc.*, 147 Ill. App. 3d 995, 1003 (1986). "Where the proposed transferee is insolvent, or of dubious financial responsibility, or has a poor payment record, the landlord's refusal to consent will not be found to be unreasonable." *Id.* "The lessor is

justified in refusing his consent until satisfactory proof of financial ability and responsibility is shown, regardless of what might later be shown in court." *Id.*

¶ 123 Under general contract principles, a material breach of a contract provision by one party may be grounds for releasing the other party from its contractual obligations. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 70 (2006). Our supreme court has referred to this as "the first-to-breach rule," stating the rule excuses a party's duty to perform under the contract if the other party materially breaches the agreement first. *PML Development LLC v. Village of Hawthorn Woods*, 2023 IL 128770, ¶ 50. "In other words, the first-to-breach rule excuses the injured party from future performance and allows the injured party to pursue its breach of contract claims." *Id.* "Conversely, the first breaching party cannot seek to enforce the contract against the injured party." *Id.*

¶ 124 However, only a "material breach" of a contract provision will justify nonperformance by the other party. *InsureOne Independent Insurance Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 33. A " 'partial breach by one party *** does not justify the other party's subsequent failure to perform.' " *Id.* (quoting *Israel v. National Canada Corp.*, 276 Ill. App. 3d 454, 460 (1995)).

¶ 125 "The test of whether a breach is material is whether it is so substantial and fundamental as to defeat the objects of the parties in making the agreement or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement." *Slyce Coal Fired Pizza Co. v. Metroplitan Square Plaza, LLC*, 2025 IL App (1st) 221279, ¶ 139. "The breach must be so material and important to justify the injured party in regarding the whole transaction at an end." (Internal quotation marks omitted.) *Id.* (quoting *InsureOne*, 2012 IL App (1st) 092385, ¶ 43). Whether a material breach of contract has been

committed is a question of fact. *Id.* ¶ 138.

¶ 126  Welk first argues there was no valid contract between himself and MKM and generally presents his arguments in terms of a lack of a valid contract or meeting of the minds among the parties regarding the issues. He generally does not address the issue in terms of whether he unreasonably withheld consent to assignment of the sublease or if plaintiffs materially breached the lease.

¶ 127  As to the lack of a contract directly between Welk and MKM, it is undisputed MKM was a sublessee of Fast Break. "A sublease is a lease between an existing tenant as a sublessor and the sublessor's tenant as a sublessee for the duration or a portion of the duration of the term remaining under the sublessor's lease with the landlord." (Internal quotation marks omitted.) *Veseli v. Miroslawa N. Figueroa Trust U/A 7/2/2008*, 2024 IL App (5th) 230560-U, ¶ 31. "There can be no privity of contract or estate between a sublessee and the original lessor because the lease does not pass to the subtenant, and there is no contractual relation between the subtenant and the lessor." (Internal quotation marks omitted.) *Id.* Further, the trial court ruled, as sublessor, MKM was a third-party beneficiary of Welk's lease with Fast Break. "A third-party beneficiary may sue under a contract even when not a party to it, provided the benefit of the contract is direct to him, as opposed to being merely incidental." (Internal quotation marks omitted.) *Barry v. St. Mary's Hospital Decatur*, 2016 IL App (4th) 150961, ¶ 82. On appeal, Welk does not argue the court erred in that ruling.

¶ 128  Here, while issues pertaining to the intent of the parties come into play, especially when addressing whether the rear parking area was part of the lease, the issue as it was presented at trial is not whether a valid contract existed between MKM and Welk. Instead, the issue is whether Welk breached the contract with Fast Break by unreasonably withholding consent to the

assignment of the sublease. In turn, if Welk unreasonably withheld consent, Welk's breach could be excused if Fast Break first materially breached the lease. Thus, we address Welk's argument in the proper legal context of whether plaintiffs proved Welk unreasonably withheld consent to the sublease and whether Fast Break materially breached the lease before Welk withheld consent.

¶ 129    We find plaintiffs sufficiently proved Welk unreasonably withheld consent to the assignment of the sublease. First, it is undisputed TA was financially responsible, was a suitable subtenant for the property, and would not be competing with any of Welk's businesses. Thus, it is undisputed plaintiffs proved they had tendered an entity who met reasonable commercial standards. However, Welk contends he reasonably withheld consent to the assignment of the sublease because plaintiffs were demanding he modify the lease to include the rear parking area and they refused to complete repairs.

¶ 130    The construction of a lease is governed by the intention of the parties who entered into the lease, and courts should ascertain and give effect to such intention as far as that may be done without contravening legal principles. *Cory v. Minton*, 49 Ill. App. 3d 312, 315-16 (1977). "The intention of the parties must be ascertained, if possible, from the language of the lease, and the words used should be given their common and generally accepted meaning." *Id.* at 316. However, "[i]n such cases where the language of a lease admits of ambiguity, either patent or latent, the court may consider the position of the parties, the surrounding circumstances which existed at the time of the execution of the lease and the facts in connection with it." *Id.* "A latent ambiguity occurs where a writing appears on its face clear and unambiguous, but which, in fact, may be shown by extrinsic evidence to be uncertain in meaning." *Id.* "Such a latent ambiguity may be demonstrated and explained by parol evidence." *Id.*

¶ 131    Here, Welk did not challenge the ability of plaintiffs to prove the parties intended

to include the rear parking area in the lease by using extrinsic evidence. While Welk presented evidence he never intended to include the rear parking area in the lease, plaintiffs presented evidence to the contrary. Feeney testified his understanding was the rear parking area was part of the lease, and there was evidence the original building plan would not have been approved had it not been included as part of the gas station and store property. Evidence was also provided that, to use the land behind the gas station and store, Welk would have to cross the Fast Break leasehold regardless of whether the rear parking area was included in the lease. Heathcock testified the omission of the rear parking area in the property description was a mistake and said Fast Break was seeking to correct the error through an amendment to the lease so it would reflect the actual intent of the parties. The jury heard and saw the witnesses and were in the best position to judge their credibility. We will not reweigh the evidence or second guess the jury's determination the omission of the rear parking area in the property description in the lease was a factor that would allow Welk to reasonably withhold assignment of the lease.

¶ 132     Welk also suggests, in a single sentence, without citation to the record or legal precedent and without an analysis of the specific provisions of the contracts, that plaintiffs sought to modify the lease to change the renewal terms. The record indicates there was a typographical error in the lease in which it is stated the "Lessor" would give the "Lessor" notice of an intent to renew it. It is illogical the parties intended Welk to have the option to renew and then only give notice to himself. Thus, one of the terms of "Lessor" likely was intended to be "Lessee." Ultimately, the parties disagreed on the meaning or effect of the renewal terms, with Feeney testifying he believed Fast Break had the option to extend the lease and Welk testifying the opposite. Given Welk's complete lack of argument or analysis on that point, we find it forfeited. Further, forfeiture aside, there was evidence presented allowing the jury to find Fast

Break held the option to renew and Welk's refusal to consent to assignment of the sublease because he believed Fast Break sought to modify the lease was unreasonable.

¶ 133   Likewise, as to repairs, the parties presented conflicting evidence. The parties presented evidence the property was generally kept clean and in good repair. Feeney and Marketti testified at length about improvements made to the property, repairs they performed, and repairs they made that were Welk's responsibility. Welk disagreed, but we note much of his photographic evidence appeared to be from 2006, when CGH was the sublessor.

¶ 134   Welk also maintained plaintiffs refused to perform any repairs unless he first assigned the sublease to TA. However, Feeney and Marketti testified that was untrue and said they agreed to perform repairs, including repairs they believed were unnecessary, in order to get the deal done. Welk himself also provided conflicting evidence in that regard. On cross-examination, he was asked, "[W]ith respect to the maintenance, your requirement was that it be done before you signed [the lease assignment], correct?" Welk responded, "[Y]es, basically that was the deal." Further, the lease did not contain any provisions stating Fast Break must make repairs in order to obtain consent to a sublease, and Welk points to no legal precedent that would require repairs to be completed before consenting to a sublease. Certainly, Fast Break was required under the master lease to maintain the premises, and a failure to do so could constitute a breach of the master lease, but Welk never declared Fast Break in default and, as we discuss further below, the jury found plaintiffs did not materially breach the lease.

¶ 135   As to any prior material breach of the lease by plaintiffs, the jury specifically found no material breach. As previously discussed, there was conflicting evidence concerning any failure of plaintiffs to complete repairs.

¶ 136   We also note Welk presents no legal citations or analysis regarding the effect of

the reorganization of Fast Break Food Mart, Inc., to Fast Break Foods, LLC. Accordingly, he forfeited any arguments on that issue.

¶ 137        Welk also argues Fast Break breached the lease when it failed to obtain written consent to sublease to MKM. Welk argues Fast Break misrepresented MKM to him as a management company and never informed him MKM was a subtenant. But Feeney testified he attempted to obtain written consent and Welk specifically gave verbal consent while refusing to give written consent.

¶ 138        Plaintiffs also presented evidence Welk knew MKM was subleasing the property. Marketti showed Welk improvements made by MKM. At one point, Welk told Feeney to communicate with MKM, stating, "[H]e is your tenant." Testimony from Heathcock further indicated Welk knew MKM was a sublessee. Heathcock stated Welk demanded a signed release by the "existing sublease company," which showed Welk knew MKM was a sublessee. Additionally, Welk never declared Fast Break was in default for failure to obtain written consent for the sublease. While the lack of written consent was a technical breach of the lease, it was a question of fact for the jury as to whether it was a material breach. As with the previous issues, we will not second guess the jury's determination there was no material breach. There was sufficient evidence supporting the jury's conclusion.

¶ 139        Finally, Welk contends there was no evidence he waived his rights under the lease. Because the jury specifically found plaintiffs did not materially breach the lease, we need not and do not reach that issue. Waiver would become an issue only had the jury found a prior material breach.

¶ 140                2. *Tortious Interference With Business Expectancy*

¶ 141        Welk next argues the evidence was contrary to a finding of willful and wanton,

and asks for the "verdict for willful and wanton" to be reversed. We note the jury was never instructed on willful or wanton conduct and there was not a "verdict for willful and wanton" conduct. Welk does not explain whether he is referring to the verdicts for tortious interference with business expectancy or punitive damages, but his argument in his appellant's brief appears to be directed to the verdict for tortious interference with business expectancy. However, in his reply brief, Welk refers to the punitive damages awards. Meanwhile Welk provides no legal citations applicable to either tortious interference with business expectancy or punitive damages awards and no cogent legal analysis explaining his contentions.

¶ 142        As previously stated, "A contention that is supported by some argument but no authority does not meet the requirements of Rule 341 and is considered forfeited." *Crull*, 388 Ill. App. 3d at 1045. Additionally, Welk raised an issue of punitive damages for the first time in his reply brief. "Arguments may not be raised for the first time in a reply brief." *Alms v. Peoria County Election Comm'n*, 2022 IL App (4th) 220976, ¶ 31 (citing Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020)). Thus, we find Welk forfeited his argument concerning punitive damages. See *id.*

¶ 143        As to tortious interference of business expectancy, while we could also find any such claim forfeited, giving Welk the benefit of the doubt and characterizing his argument as an attack on that judgment, we find the argument lacks merit.

¶ 144        In order to prevail on its claim for tortious interference with business expectancy, the plaintiff is required to prove " '(1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) the defendant's intentional and unjustified interference that prevents the realization of the business expectancy; and (4) damages resulting from the interference.' " *State Auto Property & Casualty Insurance Co. v. Distinctive Foods, LLC*, 2024 IL App (1st) 221396, ¶ 83 (quoting *Chicago's Pizza, Inc. v. Chicago's Pizza*

*Franchise Ltd. USA*, 384 Ill. App. 3d 849, 862 (2008)).

¶ 145　　　　Here, the only element clearly at issue is the third—the defendant's intentional and unjustified interference that prevents the realization of a business expectancy. For the reasons stated regarding breach of contract, we disagree that judgment notwithstanding the verdict would have been appropriate on the tortious interference with business expectancy claims. While Welk presented evidence his actions were reasonable, plaintiffs presented evidence Welk's actions were unreasonable and carried out for the purpose of extracting money or otherwise profiting from the assignment of the sublease. We will not second guess the jury's determination of the credibility of the witnesses and ultimate conclusions on that issue when there was evidence at trial supporting plaintiffs' claims.

¶ 146　　　　　　　　　　　D. Motion for a New Trial

¶ 147　　　　　　　　　　　1. *Jury Instructions*

¶ 148　　　　Welk next contends the trial court should have granted a new trial based on the court's jury instructions. He argues the instructions were faulty, resulting in the jury's verdict being against the manifest weight of the evidence. Welk maintains the court erred by denying his requested instruction that he was not required to accept a modification of the lease. He then argues the error was compounded by the court's instructions regarding subleases and waiver.

¶ 149　　　　On a motion for a new trial, a court will weigh the evidence, set aside the verdict, and order a new trial only if the verdict is contrary to the manifest weight of the evidence. *Maple*, 151 Ill. 2d at 454. " 'A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence.' " *Id.* (quoting *Villa v. Crown Cork & Seal Co.* 202 Ill. App. 3d 1082, 1089 (1990)). "A reviewing court may not set aside a trial court's ruling on a motion for a

new trial unless the trial court abused its discretion." *Cimino v. Sublette*, 2015 IL App (1st) 133373, ¶ 102. Likewise, we will not disturb a trial court's ruling with regard to jury instructions unless the trial court abused its discretion. *Kramer v. Milner*, 265 Ill. App. 3d 875, 879 (1994).

¶ 150    A trial court abuses its discretion if it ignores recognized legal principles and exceeds the bounds of reason, acts arbitrarily, or takes a position no reasonable person would adopt. *Adams v. Sarah Bush Lincoln Health Center*, 369 Ill. App. 3d 988, 1000 (2007). In determining whether the court abused its discretion, we look at whether the jury instructions as a whole were sufficiently clear so as not to mislead the jury. *Sharbono v. Hilborn*, 2014 IL App (3d) 120597, ¶ 40. "Even if the trial court errs by giving an improper instruction, a reviewing court will ordinarily not reverse the trial court unless the instruction 'clearly misled the jury and resulted in prejudice to the appellant.' " *Schnitker v. Springfield Urban League, Inc.*, 2016 IL App (4th) 150991, ¶ 35 (quoting *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 274 (2002)).

¶ 151    We first note, at the portion of the jury instruction conference in the record, when the trial court denied the instruction, it stated, "That's going to be denied. This is one I denied yesterday, correct?" The record does not contain a transcript or substitute for a transcript of the previous day's proceeding where the court denied the instruction.

¶ 152    The "appellant has the burden to present a sufficiently complete record of the proceedings" below. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984). "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Id.* at 392. Without a record of the discussion from the day before, we do not know what arguments were presented or the full basis of the trial court's decision. Absent a full record, we find the court did not abuse its discretion in refusing the instruction.

¶ 153 Further, forfeiture aside, the trial court correctly instructed the jury regarding the law, telling the jury plaintiffs must show Welk's refusal to consent to assignment of the sublease was unreasonable and further instructing the jury plaintiffs were required to show TA was ready, willing, and able to take over the lease and met reasonable commercial standards. Welk was then able to present his argument concerning modification of the lease to the jury. Indeed, during closing arguments, Welk specifically argued plaintiffs were seeking unreasonable modifications to the lease and, therefore, TA was not ready, willing, and able to take over MKM's sublease. Thus, the jury was not prevented from hearing his argument concerning modification of the lease. Accordingly, Welk has not shown prejudice from the lack of an instruction specific to modification.

¶ 154 Welk also contends the trial court erred in instructing the jury on waiver. However, we need not and do not discuss that issue because the jury never reached the issue. Because the jury specifically found plaintiffs did not materially breach the lease, the jury did not address waiver. Accordingly, even if we were to find the court erred by giving the instruction, Welk cannot show the instruction resulted in prejudice.

¶ 155 2. *Fast Break's Damages Award*

¶ 156 Welk next contends a new trial is appropriate because when the jury awarded MKM damages, it offset the award by the amount of rent MKM saved by withdrawing from the remainder of the contract, but the jury did not apply such an offset to Fast Break's damages.

¶ 157 We first note Welk has failed to provide any legal authority for his argument the jury was required to apply an offset in its damages calculation. Thus, Welk forfeited the issue.

¶ 158 Forfeiture aside, we note Welk agreed to an instruction regarding Fast Break's damages that did not include the offset found in the instruction regarding MKM's damages.

Further, we note Fast Break argues, when MKM terminated its sublease, Fast Break lost its rent from MKM, faced difficulty in obtaining new sublessees, and would have sustained even higher damages had it not mitigated damages by seeking a finding Welk materially breached the lease so that it could be excused from its own future performance. We agree. Accordingly, Welk is not entitled to a new trial based on the jury's calculation of Fast Break's damages.

¶ 159                                    E. Prejudgment Interest

¶ 160          Welk next contends the trial court erred in awarding prejudgment interest to both plaintiffs. In doing so, Welk states plaintiff sought interest under section 2-1303 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1303) (West 2022)). However, Welk misrepresents the statutory section at issue. Section 2-1303 of the Code addresses postjudgment interest in actions involving consumer debt or actions to recover damages for personal injury or wrongful death. That was not the statutory section applied by the parties and the court. Instead, plaintiffs sought and were awarded prejudgment interest under the Interest Act. The Interest Act provides:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment. In the absence of an agreement between the creditor and debtor governing interest charges, upon 30 days' written notice to the debtor, an assignee or agent of the creditor may charge and collect interest as provided in this Section on behalf of a creditor." 815 ILCS 205/2 (West

2022).

¶ 161    Welk makes no argument concerning the validity or application of the Interest Act to an action involving unreasonable consent to a sublease. However, that section has been applied in breach of contract cases. See. *Phelps v. O'Malley*, 159 Ill. App. 3d 214, 221 (1987); *Spagat v. Schak*, 130 Ill. App. 3d 130, 137-38 (1985) (applying the Interest Act to real estate contracts). A lease is also an instrument in writing. See *De Kalb Bank v. Purdy*, 166 Ill. App. 3d 709, 724 (1988). When prejudgment interest is awarded under the Interest Act, a reviewing court "will not disturb the trial court's findings of fact pertinent to prejudgment interest unless those findings are contrary to the manifest weight of the evidence." *Milligan v. Gorman*, 348 Ill. App. 3d 411, 416 (2004).

¶ 162    We first note Welk specifically stated in the trial court he did not dispute the award of prejudgment interest to Fast Break. "Illinois has long subscribed to the proposition that a party cannot claim as error that which it has induced." *Old Second National Bank v. Indiana Insurance Co.*, 2015 IL App (1st) 140265, ¶ 41. "Under the doctrine of invited error, a party may not request or induce the trial court to proceed in one manner and later contend on appeal that the course of action was in error." *Id.* (citing *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004)); *Morris v. Banterra Bank*, 159 Ill. 2d 551, 552 (1994)). Thus, we reject Welk's argument the court abused its discretion by awarding prejudgment interest to Fast Break.

¶ 163    As to the award of prejudgment interest to MKM, Welk provides quotes from several cases and then asserts the trial court wrongly awarded interest to MKM because (1) there was no evidence of a direct subcontract between Welk and MKM, (2) assuming there was a contractual relationship, there was no evidence of breach by Welk, (3) nothing in the contracts provided for damages other than attorney fees, (4) the damages claimed were not easily

calculated or foreseeable, and (5) there was no debtor and creditor relationship between MKM and Welk. We find the court erred in awarding prejudgment interest to MKM because there was no direct contract between Welk and MKM.

¶ 164    Here, MKM specifically told the trial court it was seeking prejudgment interest based on an instrument of writing instead of an unreasonable and vexatious delay in payment. There also was no evidence of money due to MKM under a contract or of a debtor and creditor relationship. While the court previously found MKM was a third-party beneficiary of the contract and Welk has not challenged that finding on appeal, the remedies available to third-party beneficiaries are generally a matter of common-law principles. See, *e.g.*, *Ardon Electric Co. v. Winterset Construction, Inc.*, 354 Ill. App. 3d 28, 38 (2004) (describing the ability to sue as a third-party beneficiary as a "common-law right"). Here, the award of prejudgment interest was purely statutory and required an instrument of writing between Welk and MKM. Because there was no such instrument of writing between them, we reverse the award of prejudgment interest to MKM.

¶ 165                                    F. Motion for Attorney Fees on Appeal

¶ 166    Finally, plaintiffs each filed a motion on appeal requesting this court remand with directions to award attorney fees and costs for the appeal. Plaintiffs note the lease specifically provided for an award of fees in connection with a party's action to enforce the contract or in defending any proceeding under the contract. Welk responded if plaintiffs were successful on appeal, he generally does not dispute the concept that, as the prevailing parties, they would be entitled to attorney fees. We took the motions with the case.

¶ 167    "Provisions in contracts for awards of attorney fees are an exception to the general rule that the unsuccessful party is not responsible for payment of such fees." *MXL*

*Industries, Inc. v. Mulder*, 252 Ill. App. 3d 18, 32 (1993). Here, the lease provided the lessor or lessee would be responsible for all reasonable attorney fees incurred by the other in enforcing the terms of the lease or in defending any proceeding to which lessor or lessee was made a party defendant as a result of the acts or omissions of the other party. The trial court awarded fees, and "[a]n appeal is a continuation of the same action." *Erlenbush v. Largent*, 353 Ill. App. 3d 949, 953 (2004). Accordingly, in light of our disposition of the preceding issues finding in favor of plaintiffs, we remand this cause for a determination of reasonable appellate attorney fees. See *id.*; *Mulder*, 252 Ill. App. 3d at 32.

¶ 168                                  III. CONCLUSION

¶ 169          For the reasons stated, the judgment of the trial court is affirmed in part and reversed in part. We remand with directions for a determination of reasonable appellate attorney fees to be awarded to plaintiffs.

¶ 170          Affirmed in part and reversed in part; cause remanded with directions.

¶ 171          JUSTICE DOHERTY, specially concurring:

¶ 172          I join in the order disposing of this case in all respects and without reservation. As noted in the disposition, the court did not address several issues because they were forfeited for a variety of reasons. Some of the issues which *are* addressed on appeal flow out of issues that were either not decided below or forfeited on appeal. I write only to caution against reading our resolution of the issues addressed as offering any inferential insight into the issues which were not.

¶ 173          For example, I note that each plaintiff has recovered against Welk on both a contract theory and a tort theory. Normally, the basis of a recovery in tort is different from the basis that would permit recovery under contract, as the duties arise in different ways. See *Collins*

*v. Reynard*, 154 Ill. 2d 48, 51 (1992). The fact that the propriety of recoveries under both theories has not been addressed should not suggest any opinion from us on the matter.

¶ 174        Furthermore, there is only one contract at issue here, and Fast Break is the only plaintiff who is a named party to it. Welk has not challenged the trial court's ruling that MKM was a third-party beneficiary of the contract between Fast Break and Welk, so our failure to comment on it should not be viewed as stating any opinion on the trial court's third-party beneficiary analysis.